IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELO LENELL DAVIS, | ) | |
| | ) | Civil Action No. 11 –1506 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Chief Magistrate Judge Lenihan |
| | ) | |
| MICHAEL HARLOW, *et al.*, | ) | |
| | ) | ECF No. 97 |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This case is before the Court on the Motion for Summary Judgment filed by the Defendants on November 15, 2013.[1] (ECF No. 97.) In accordance with this Court's Memorandum Opinion and Order dated March 22, 2013 (ECF No. 72), the only claims remaining in Plaintiff's Second Amended Complaint (ECF No. 46) are for five alleged instances of retaliation. For the following reasons, the Motion for Summary Judgment will be granted.

**I.    BACKGROUND**

Angelo Lenell Davis ("Plaintiff") is a state prisoner who alleges that he was mistreated while he was incarcerated at SCI-Greene. The following is a brief summary of facts pertinent to the five remaining claims of retaliation:

A. <u>Plaintiff's Classification Level and Cell Move History</u>

Plaintiff was found guilty of aggravated assault and sentenced to 40 to 120 months incarceration, with a maximum sentence date of March 16, 2016. (Def's Exh. 1, Sentencing Documents, ECF No. 100-1 at pp.1-8.) Plaintiff arrived at SCI-Greene on May 28, 2008. (Def's Exh. 2, Cell Move History, ECF No. 100-1 at pp.9-12.) From June 2008 until December 21,

---

[1] Defendants who are numerous Pennsylvania Department of Corrections prison officials and employees at SCI-Greene.

2008, Plaintiff was housed on SCI-Greene's J Unit, where Susan Cowan was Unit Manager and Donna Nicholas was a J Unit Counselor. (Def's Ex. 24, Cowan Declaration, ECF No. 100-3 at pp.9-13, ¶ 2.) J Unit was a self-contained, low security housing unit outside the facility perimeter where inmates had the opportunity to work and engage in other activities under lesser levels of supervision. Id. J Unit is no longer in operation and has been converted to a Community Corrections Center. Id.

Plaintiff was returned to the main prison due to a death in his family in late December 2008. Id. at ¶ 3. According to the DOC, whenever an inmate experiences any type of catastrophic event, he is moved and held inside the institution as a matter of standard policy, in light of security and safety concerns. Id. At that point, Plaintiff was assigned to C Block (a level 3 security housing unit) where he remained until September 23, 2010. (Def.'s Exh. 2, Cell Move History, ECF No. 100-1 at pp.9-12); (Def.'s Exh. 24, Cowan Declaration, ECF No. 100-3 at pp.9-13, ¶ 4.) Defendant Cowan was moved to C Block as well, and David Swartz was the C Block Counselor. (Def.'s Exh. 24, Cowan Declaration, ECF No. 100-3 at pp.9-13, ¶ 4.)

Plaintiff was moved to K Unit on September 23, 2010, and remained there until May 9, 2011. (Def's Exh 2, Cell Move History, ECF No. 100-1 at pp.9-12.) His Unit Manager on K was Macknair and his Counselor was Staley. (Def's Exh. 13, Grievance 339321, ECF No. 100-2 at pp.8-20); (Def's Exh. 16, Misconduct B325022, ECF No. 100-2 at pp.35-47.) Plaintiff was in the Restricted Housing Unit ("RHU") from May 9, 2011, until July 11, 2011, and then assigned to E Block from July 11, 2011, until August 16, 2011. (Def's Exh. 2, Cell Move History, ECF No. 100-1 at pp.9-12.) On August 16, 2011, Plaintiff moved to B Block where he remained until June 1, 2012. Id. His Unit Manager on B Block was Guyton and his Counselor was Burris. (Def's Exh. 23, Guyton Declaration, ECF No. 100-3 at pp.5-8, ¶¶ 1-5.)

Plaintiff was classified as a Custody Level 2 inmate from the time of his arrival at SCI-Greene in May 2008, until May 9, 2011, when he received a misconduct and was sent to the RHU. (Def's Exh. 2, Cell Move History, ECF No. 100-1 at pp.9-12.) Upon return to general population (E and B Blocks) in July 2011, he was a Custody Level 3 inmate, and then reclassified as a Custody Level 2 inmate in early 2012. (Def's Exh. 2, Cell Move History, ECF No. 100-1 at pp.9-12); (Def's Exh. 25, Rogers Declaration, ECF No. 100-3 at pp.14-16, ¶4); (Def's Exh. 23, Guyton Declaration, ECF No. 100-3 at pp.5-8, ¶3.)

B. Plaintiff's Parole Staffing – January 28, 2010

Plaintiff had a staffing for parole on January 28, 2010. (Def's Exh. 8, Redacted Vote Sheets for 1/28/10 and 10/6/11 Staffings, ECF No. 100-1 at pp.48-51.) As part of his Unit Team at that time, Unit Manager Cowan and Counselor Swartz participated in the January 28, 2010 parole staffing. (Def's Exh. 24, Cowan Declaration, ECF No. 100-3 at pp.9-13, ¶ 5.) According to Cowan, when conducting a parole staffing, she, as Unit Manager, gathers the Unit Team (including herself and Counselor Swartz, and a Block Officer who is familiar with the inmate's behavior), and they consider all relevant information about the inmate's misconduct and employment history, his housing reports, his program completion and overall behavior. Id. at ¶ 6. The inmate is also present; he participates in the staffing and is interviewed. Id. Key to this process is the inmate's ability to discuss his crime and admit to what happened. Id. According to Cowan and Guyton, the Unit Team does not consider whether or not an inmate has filed grievances or complained about staff. (Def's Exh. 24, Cowan Declaration, ECF No. 100-3 at pp.9-13, ¶ 7); (Def's Exh. 23, Guyton Declaration, ECF No. 100-3 at pp.5-8, ¶ 6.)

Cowan recalls Plaintiff's January 28, 2010 staffing. (Def's Exh. 24, Cowan Declaration, ECF No. 100-3 at pp.9-13, ¶ 8.) She states that Plaintiff was vehement about re-living or re-

3

trying his criminal trial and would not accept any responsibility for what happened. Id. There was a unanimous vote not to support Plaintiff for parole at that time, mainly because of his own refusal to accept responsibility for his crime. Id. at ¶ 9. Plaintiff subsequently had the opportunity to interview with the Parole officials who make the ultimate determination, and the record indicates that his refusal to admit or accept responsibility for his crime was one of the factors for the Parole Board's denial of parole on May 24, 2010. (Def's Exh. 7, Parole Board Decisions – 4/24/09, 5/24/10, 1/27/12, ECF No. 100-1 at pp.41-47); (Def's Exh. 24, Cowan Declaration, ECF No. 100-3 at pp.9-13, ¶ 9.)

    C. <u>Plaintiff's Misconducts – Early 2011</u>

As previously stated, Plaintiff was moved to K Unit on September 23, 2010. (Def's Exh. 2, Cell Move History, ECF No. 100-1 at pp.9-12.) Plaintiff was one of 58 inmates moved from C to K Unit to make room for incoming inmates. (Def's Exh. 13, Grievance 339321, ECF No. 100-2 at pp.8-20.) In early 2011, Plaintiff was issued several misconducts for refusing to obey orders (he had failed to stand for count despite receiving prior warnings). (Def's Exh. 14, Misconduct A213185 – 2/25/11, ECF No. 100-2 at pp.21-24); (Def's Exh. 15, Misconduct A213170 – 4/20/11, ECF No. 100-2 at pp.25-34.) On May 6, 2011, Plaintiff wrote a request slip to his counselor on K Unit (Staley) stating that he should be moved before there is bloodshed. (Def's Exh. 16, Misconduct B325022 – 5/6/11, ECF No. 100-2 at pp.35-47.) This incident was investigated by the Security Office and a misconduct was issued to Plaintiff by Baker for threatening another person. Id. Plaintiff was found guilty at the misconduct hearing and sanctioned to 60 days disciplinary custody. Id. However, on July 18, 2011, the misconduct was dismissed with prejudice by the Chief Hearing Examiner, who construed Plaintiff's statements as expressing his intention to defend himself if subject to attack. Id.

D. <u>Plaintiff's Transfer to B Block in August 2011</u>

Plaintiff was transferred to B Block after leaving the RHU in August 2011. (Def's Exh. 2, Cell Move History, ECF No. 100-1 at pp.9-12); (Def's Exh. 23, Guyton Declaration, ECF No. 100-3 at pp.5-8, ¶¶ 2-3.) While B Block is considered a Security Level 4 Unit, it still houses many Custody Level 2 or 3 inmates, housing assignments being dictated by institutional space and housing needs. Id. Being housed on B Block does not impact or restrict most privileges available to a Custody Level 2 or 3 inmate, particularly phone, library, activity and work privileges. (Def's Exh. 23, Guyton Declaration, ECF No. 100-3 at pp.5-8, ¶ 3.) The main difference between a Level 3 and 4 Block involves yard time – typically B Block will have only one yard time on weekend days, whereas C and K (Level 3 Units) may have two yards per day on weekends. Id.

E. <u>Plaintiff's Parole Staffing – October 6, 2011</u>

Plaintiff had another parole staffing on October 6, 2011, while he was on B Unit. (Def's Exh. 8, Redacted Vote Sheets for 1/28/10 and 10/6/11 Staffings, ECF No. 100-1 at pp. 48-51); (Def's Exh. 23, Guyton Declaration, ECF No. 100-3 at pp.5-8, ¶ 5.) Guyton and Burris supported Plaintiff for parole and provided that information and recommendation to the CCPM, the Deputies and the Superintendent. (Def's Exh. 23, Guyton Declaration, ECF No. 100-3 at pp.5-8, ¶ 5.) The Superintendent, however, was concerned that Plaintiff continued to refuse to accept responsibility for his crime. Id. at ¶ 7. The Parole Board's January 27, 2012 denial again cited Plaintiff's failure to accept responsibility for his crime, among other reasons. (Def's Exh. 7, Parole Board Decisions – 4/24/09, 5/24/10, 1/27/12, ECF No. 100-1 at pp.41-47.)

F. <u>Plaintiff's Transfer to K Block and Denial of Incentive-Based Transfer</u>

After a period of time and positive adjustment on B Block (from August 2011, until May 2012), Guyton granted Plaintiff the opportunity to move to K Block on June 1, 2012. (Def's Exh. 23, Guyton Declaration, ECF No. 100-3 at pp.5-8, ¶ 4.) However, after less than two weeks, Plaintiff asked to return to B Block. Id. Then in June 2012, Plaintiff submitted a request for an incentive-based transfer. Id. at ¶ 8. This was denied because he was not eligible until April 2013 (an inmate must be misconduct-free for two years, and he had a misconduct in April 2011). Id. Plaintiff re-applied for the incentive-based transfer in April 2013. Id. at ¶ 9. He met the minimum criteria, was staffed in May 2013 and approved. Id. Both Counselor Burris and Unit Manager Guyton recommended the transfer, which occurred in October 2013 when Plaintiff was transferred to SCI-Camp Hill. Id.

## II.   STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the

6

evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

### III. DISCUSSION

The only surviving claims in Plaintiff's Second Amended Complaint involve allegations of retaliation for his filing of grievances.[2] It is well settled that retaliation for the exercise of a constitutionally protected activity is itself a violation of rights secured by the Constitution, which is actionable under section 1983. Rauser v. Horn, 341 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir. 1990). However, merely alleging the fact of retaliation is insufficient; in order to prevail on a retaliation claim, a plaintiff must show three things: (1) that the conduct in which he engaged was constitutionally protected; (2) that he suffered "adverse action" at the hands of prison officials;[3] and (3) that his constitutionally protected conduct was a

---

[2] In his response to Defendants' Motion to Summary Judgment, Plaintiff attempts to relitigate numerous claims that have already been dismissed and raise new claims for the first time. Such claims, however, will not be considered.

[3] With respect to the second factor, an adverse action is one "sufficient to deter a person of ordinary firmness from exercising his rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000).

7

substantial motivating factor in the defendants' conduct.[4]  Rauser, 241 F.3d at 333 (adopting Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  Once Plaintiff has made his *prima facia* case, the burden then shifts to Defendants to prove by a preponderance of the evidence that he or she "would have made the same decision absent the protected conduct for reasons reasonably related to penological interest."  Rauser, 241 F.3d at 334 (incorporating Turner v. Safley, 482 U.S. 78, 89 (1987)).

Plaintiff alleges that he was retaliated against for filing grievances, which is a protected activity.  See Booth v. King, 346 F. Supp. 2d 751, 762 (E.D. Pa. 2004); Allah v. Al-Hafeez, 208 F. Supp. 2d 520, 535 (E.D. Pa. 2002).  The Court will therefore examine the final two factors in connection with the five remaining claims.

1. Parole Staffings

Plaintiff's first retaliation claim is that he was denied parole on two occasions due to unfavorable recommendations and submission of false, misleading reports to the Parole Board. The two parole staffings at issue occurred on January 28, 2010 (in advance of the May 25, 2010 Parole Board denial) and on October 6, 2011 (in advance of the January 27, 2012 Parole Board denial).  Plaintiff asserts this retaliation claim against Defendants Cowan, Nickolas, Swartz, Macknair, Staley, Guyton and Burris. The Court agrees with the Defendants that the only individuals with any personal involvement in connection with this claim are (1) Cowan and Swartz, who handled the January 28, 2010 staffing while Plaintiff was assigned to C Block, and (2) Guyton and Burris, who handled the October 6, 2011 staffing while Plaintiff was housed on

---

[4] This third element, causation, requires a plaintiff to prove either (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.  See Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997).

B Block. Therefore, Defendants Nickolas, Macknair and Staley will be dismissed based on their lack of personal involvement in the alleged wrongful acts related to Plaintiff's parole denials.

Plaintiff does not dispute that the Parole Board makes the ultimate determination as to whether to grant or deny an inmate parole, and in Plaintiff's case the Board expressed many reasons for denying him parole beyond his failure to receive institutional support. Some of the reasons given by the Board for both its May 24, 2010 and January 27, 2012 denials include: Plaintiff's risks and needs assessment which indicated his level of risk to the community, his failure to demonstrate motivation for success, his denial of the nature and circumstances of his offense, his refusal to accept responsibility for the offense and lack of remorse. The Parole Board also cited the negative recommendation of the trial judge as a reason for its decision.

    a. <u>January 28, 2010 Parole Staffing</u>

According to Defendant Cowan, who states that she specifically recalls Plaintiff's interview during the January 28, 2010 staffing, Plaintiff insisted that his victim ran her own head into the stairway post despite the fact that records reflected a fairly gruesome crime scene with blood on the walls. The Unit Team, the Corrections Classification Program Manager (CCPM), the Deputies, and the Superintendent (who makes the final determination with regard to institutional support) unanimously voted not to support Plaintiff for parole at that time, mainly because of his own conduct and statements during the staffing interview and refusal to accept responsibility for his crime.

Defendant Cowan states that the existence of grievances has no role in the staffing process and she denies being aware of any grievance filed by Plaintiff against her prior to the January 28, 2010 staffing. She states that it was only after the staffing that Plaintiff seemed to focus on her and blame her for his problems. For example, after the staffing, Plaintiff wrote to

9

Cowan on February 1, 2010, and accused her of bias and prejudice in the interview, in removing him from Batterer's Group, denying him a transfer or pre-release, and denying his return to outside housing on J Block. Plaintiff then filed three grievances on February 22, 2010, and a fourth in March, all saying essentially the same thing, i.e., that he wanted a transfer due to a personal conflict with Cowan and accusing her of bias in connection with various issues, including the parole staffing and his inability to return to J Block. Cowan states that she was unaware of these grievances because they were never assigned to staff for responses.

Plaintiff disputes Defendant Cowan's version of events and maintains that he filed grievances against her prior to his parole staffing. Plaintiff points to Grievance 274350, in which he complained that he was not returned to outside housing on J Block after serving the required thirty days inside the facility after his brother's death. He also complained that he was improperly denied the privileges associated with his custody level and the opportunity to complete Batter's group, a requirement for his parole. The Grievance is dated May 26, 2009, and was denied by Defendant Cowan on June 5, 2009. Plaintiff also points to Grievance 275144 dated June 2, 2009, wherein he raised identical issues. It, too, was denied by Defendant Cowan.

While Plaintiff is correct that these two grievances were filed before he was staffed for parole on January 28, 2010, neither grievance is specifically directed against Defendant Cowan. In fact, in Grievance 275144 Plaintiff complained that it was Ms. Murphy who wrongfully kept him from completing Batter's group; he did not even mention Defendant Cowan. The Court notes that Plaintiff's primary complaint in both of these grievances, which is also overwhelmingly the subject of his lengthy opposition to the summary judgment motion, is that he was not returned to J Block after being moved inside the institution on December 21, 2008.

Because of this he was unable to complete the Batter's group that he was attending and not approved for an incentive based transfer to SCI-Camp Hill.

First, the Court notes that Plaintiff initially alleged that he was denied parole because of the filing of grievances, which is a protected activity under the First Amendment. *See*, *infra*. Now, however, he claims that he was denied parole because he would not accept responsibility for his crime and was exercising his right to remain silent under the Fifth Amendment by refusing to say anything at his parole staffing that could later be used against him.[5] This, however, is not a protected activity for purposes of a retaliation claim. *See*, *e.g.*, Brown v. Mahoney, 2007 U.S. Dist. LEXIS 103185 (D.MT June 4, 2007) (Finding inmate had no Fifth Amendment privilege with respect to crimes of which he had already been convicted).

Notwithstanding these conflicting allegations as to the protected conduct at issue, Plaintiff has failed to raise a material issue of fact to demonstrate that his engaging in any protected conduct was a substantial motivating factor in Defendant Cowan and Swartz's decision to not recommend him for parole. There is no evidence of false or misleading reports being submitted to the Parole Board. Moreover, the record shows that Plaintiff was denied parole for many reasons, not simply because of lack of institutional support. Nevertheless, all those who voted, not just Defendants Cowan and Swartz, voted against parole. The vote was unanimous. Therefore, even if there was evidence of retaliatory intent on the part of Cowan and Swartz, Plaintiff still would not have been granted parole. Because of these reasons, Plaintiff's claim cannot survive summary judgment.

    b. October 6, 2011 Parole Staffing

---

[5] He also claims that he was denied parole because of the nature of his crime – i.e., that he was convicted for assaulting a white woman.

Plaintiff also alleges that Defendants Guyton and Burris retaliated against him in connection with his October 6, 2011 staffing. However, the record indicates that both Guyton and Burris supported parole following Plaintiff's staffing. The final decision on the institution's recommendation for parole is made by the Superintendent, and in this case the Superintendent rejected Guyton and Burris's recommendation because he was still concerned about Plaintiff's refusal to accept responsibility for his crime.

Because Defendants Guyton and Burris did not take any adverse action against Plaintiff with regard to his parole staffing, Plaintiff has failed to show the existence of any retaliatory conduct. Thus, this claim also fails to survive summary judgment.

2. Transfer to K Block

Plaintiff next claims that, instead of receiving an incentive-based transfer, he was transferred from C Block to K Block in retaliation for filing grievances. Defendants state that Plaintiff was one of 58 inmates moved from C to K Block in order to make room for incoming inmates. Plaintiff was moved on September 23, 2010, and remained on K Block until May 9, 2011, when he was sent to the RHU after being found guilty of a misconduct.

The record indicates that Plaintiff requested an incentive-based transfer on May 22, 2009, but he did not meet the criteria until May 24, 2010. After losing eligibility due to a misconduct in April 2011, Plaintiff ultimately received an incentive-based transfer to SCI-Camp Hill in October 2013.[6]

While Plaintiff may have met the minimum eligibility requirements for an incentive-based transfer prior to his transfer to K Block, he asserts no facts that would support a finding of retaliation by any Defendant for his filing grievances. Plaintiff's allegations are pure surmise.

---

[6] According to Defendants, an inmate must be misconduct-free for two years to receive an incentive-based transfer and once eligible it can take months to finalize the transfer.

He does not state how he came to know that he was denied an incentive-based transfer for filing grievances, if he was denied one at all during the time he was eligible.[7] Speculation is not a substitute for personal knowledge, and conclusory assertions on summary judgment, even sworn to, are insufficient to create a genuine issue of material fact. *See* Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). *See also* Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"); Curl v. International Business Machines, Corp., 517 F.2d 212, 214 (5th Cir. 1975) ("[T]he party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and . . . the opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof."); Manganaro v. Delaval Separator Co., 309 F.2d 389, 393 (1st Cir. 1962) ("While we believe that the plaintiff is entitled to all favorable inferences, he is not entitled to build a case on the gossamer threads of whimsy, speculation and conjecture."). For these reasons, Plaintiff's claim does not survive summary judgment.[8]

3. <u>Withdrawal of Grievance</u>

Plaintiff states that on May 13, 2011, Defendants Young, Martin and Ferrier intimidated him into withdrawing a grievance that he had filed accusing various K Block officers (including the Defendants) of harassing him in various ways. Because Plaintiff does not state what

---

[7] While the record indicates that Plaintiff applied for and was denied an incentive-based transfer in May 2009, it is unclear when he next applied.

[8] The Court assumed Plaintiff was raising this claim against Defendants Swartz, Macknair and Winfield, it is utterly unclear at which Defendant this claim is directed. Nevertheless, the Court finds that Plaintiff's claim fails against all named Defendants.

grievance he is referring to, the Court assumes that it is Grievance 361489, which Plaintiff filed on April 13, 2011 and withdrew on May 13, 2011.

In Grievance 361489, Plaintiff complained that Defendant Ferrier was harassing him about coming out of his cell late for line movement. Plaintiff wrote that the day shift, including Defendants Young, Martin and Ferrier, were "serious" about sending him to the hole and he requested to be moved back to C Block until he was transferred. The record shows that Plaintiff withdrew the grievance after speaking to Lieutenant Bupka on May 13, 2011.

In response to summary judgment, Plaintiff maintains that he filed three grievances (Grievances 361489, 361490, 362358) against Defendants Young, Martin and Ferrier and that on May 13, 2011, Lieutenant Bupka asked that he withdraw all three of them. Interestingly, Plaintiff states that it was Lieutenant Bupka who "intimidated" him into withdrawing the grievances, not Defendants Young, Martin and Ferrier. Thus, these Defendants appear not to have any personal involvement in this claim whatsoever.

Nevertheless, assuming Plaintiff meant to bring this claim against Lieutenant Bupka, Plaintiff has failed to meet his burden of proof. He does not state the nature of the intimidation allegedly used by Lieutenant Bupka and his own statements appear to belie any allegation that he was actually intimidated into withdrawing the grievance. Plaintiff states that the Lieutenant came to investigate the three grievances and asked that Plaintiff withdraw them since he was no longer in K Block, having received a misconduct and sent to the RHU. He states that the two had a "long discussion" and that he ultimately agreed to withdraw the one against Defendant Ferrier because she was the "weakest link". He does not claim to have been threatened by Lieutenant Bupka or forced into withdrawing the grievance. Instead, he essentially states that he willingly withdrew it and for reasons other than intimidation. While Plaintiff may have felt

14

pressured to do so by the Lieutenant, this alone is not enough to survive summary judgment. Therefore, the summary judgment motion will be granted as to this claim.

4. False Misconduct

Plaintiff claims that on May 9, 2011, he was issued a false misconduct in retaliation for filing grievances. The misconduct stemmed from a request slip that he wrote to his counselor on K Unit (Defendant Staley) on May 6, 2011. Plaintiff wrote in the request slip that he should be moved before there is "bloodshed" due to his cellmate's rough-housing. Plaintiff said that he had warned his cellmate on numerous occasions that his hands "are registered as weapons and [he] didn't need another charge of aggravated assault." This incident was investigated by the Security Office, and Plaintiff was issued a misconduct by Defendant Baker for threatening another person. Plaintiff was found guilty at the misconduct hearing and sanctioned to 60 days of disciplinary custody. However, the misconduct was later dismissed with prejudice at the final appeal stage by the Chief Hearing Examiner, who construed Plaintiff's statement as expressing his intention to defend himself if subject to an attack.

Plaintiff seems to equate dismissal of the misconduct on appeal as proof that the misconduct was false. However, there is no question that Plaintiff did, in fact, make the statements alleged in the misconduct. The reversal at final review was not due to a mistake of fact or because the charging officer lied or committed fraud. Instead, the Chief Hearing Examiner simply had a different interpretation of Plaintiff's statements and drew a different conclusion. Ironically, he noted that it would have been appropriate to charge Plaintiff with a different violation – using inappropriate language.

Defendants have met their burden of showing that the misconduct would have been issued regardless of any retaliatory intent. The record reflects that Defendants had a legitimate

penological reason for pursuing the misconduct and that there was at least some evidence to support the hearing examiner's finding of guilt. Thus, Plaintiff's retaliation claim in connection with him receiving this misconduct fails.

5. Custody Level 3 Classification and Transfer to B Block

Finally, Plaintiff claims that after dismissal of the aforementioned misconduct and release from the RHU in June 2011, his custody level 2 privileges were not restored and he was transferred to B Block, a custody level 4 unit, in retaliation for grievances that he had filed.[9]

The record reflects that B Block is a security level 4 unit but that the DOC houses many custody level 2 and 3 inmates in that unit depending on space and its current housing needs. Furthermore, according to Defendants, being housed on B Block does not impact or restrict most privileges available to a custody level 2 or 3 inmate, except for yard time. In this case, Plaintiff was classified as a level 3 inmate during the initial months he spent on B Block. However, he maintains that he should have been classified as a level 2 inmate when his misconduct was dismissed by the Chief Hearing Examiner.

According to Defendant Rogers, the classification process is confidential but many factors weigh into an inmate's classification, including misconducts, employment history, and housing reports. Although Plaintiff had one misconduct dismissed, the record shows that he still had two prior misconducts for refusing to obey orders, and Defendant Rogers states that these would have been a factor in re-classifying him to a custody level 3 inmate. Plaintiff was ultimately reclassified to a level 2 inmate in early 2012 and he was moved to K Block, a level 3

---

[9] Plaintiff brought this claim against Defendant Rogers who is the Corrections Classification Program Manager at SCI-Greene, but Rogers states that he had nothing to do with Plaintiff's housing or custody level decisions. However, determining whether or not he had any personal involvement with respect to this claim is unnecessary as Plaintiff's retaliation claim fails to survive summary judgment.

16

unit, on June 1, 2012. However, after less than two weeks, he asked to return to B Block, a level 4 unit.

Again, Plaintiff's allegation that he was put on B Block and re-classified to a level 3 inmate in retaliation for filing grievances is surmise and he has not shown how he knows this to be true. It is clear that his claim is based purely on speculation, which does not create an issue of fact for purposes of summary judgment. *See*, *infra*. Moreover, Plaintiff's real complaint in this whole action appears to be that he was not transferred back to J Block following the time spent inside the facility after his brother's death, nor transferred to a facility in his home region despite his eligibility in 2010. Virtually every action taken by any individual that influenced these two events Plaintiff conclusively claims was in retaliation for his filing grievances. While his allegations survived dismissal for failure to state a claim, without more his claims cannot survive summary judgment. Thus, Defendants' Motion for Summary Judgment will be granted.[10] A separate Order will issue.

Dated: August 26, 2013.

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
Chief United States Magistrate Judge

Cc: Angelo Lenell Davis
GY-7304
S.C.I. Camp Hill
P.O. Box 200
Camp Hill, PA 17001-0200

---

[10] Defendants argue that some or all of the claims are not exhausted. Due to the numerous grievances filed by Plaintiff, and the fact that the Court has concluded that the remaining claims do not survive summary judgment, the Court has determined not to address the exhaustion issue.

17

*Via First Class Mail*

Counsel of Record
*Via CM/ECF Electronic Mail*